2005 ME 9

**Jenny WARREN**

v.

**Claude WARREN.**

Supreme Judicial Court of Maine.

Argued: Nov. 17, 2004.
Decided: Jan. 18, 2005.

Michael P. Asen, Esq. (orally), MittelAsen, LLC, Portland, for plaintiff.

Leonard M. Gulino, Esq. (orally), Berstein, Shur, Sawyer & Nelson, P.A., Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Claude Warren appeals from a divorce judgment entered in the District Court (Portland, *Horton, J.*), adopting the report of a referee. Claude contends that the court erred by (1) including in the marital estate the increase in value of stock acquired by Claude before the marriage, based on a finding that the increase resulted from marital labor pursuant to 19–A M.R.S.A. § 953(2)(E)(2)(b) (Supp. 2004); (2) failing to award Claude reimbursement support even though the divorce occurred shortly after Jenny Warren received her MBA; and (3) distributing the marital property approximately equally. We affirm the judgment.

## I. CASE HISTORY

[¶ 2] Jenny Warren filed the action for divorce in May 2002. In March 2003, the District Court entered a stipulated order appointing a referee pursuant to M.R. Civ. P. 53(a). The referee held a hearing over three days in June 2003, and filed a report with the District Court in November 2003. The case history is based on the record developed at the hearing.

[¶ 3] In the late 1970s, Claude, a machinist, joined the newly-formed Bushmaster Firearms, Inc. He was hired by the company's majority stockholder to get the production lines up and running. Jenny went to work at Bushmaster in the late 1980s. The parties met at work, and were married on September 3, 1989.

[¶ 4] Before the marriage, Claude had acquired 1260 shares of the capital stock of Bushmaster Firearms. He acquired 211 additional shares during the marriage. The 1471 shares owned by Claude represent approximately 13.96 percent of the company's issued and outstanding stock. The majority of shares of the closely held corporation is owned by a single stockholder.

[¶ 5] Claude initially designed the products and created the assembly lines for Bushmaster. In later years, he was in charge of production. His titles included Vice President for Manufacturing and Vice President for Operations. He was responsible for product design, purchasing, manufacturing, and hiring and supervising production employees.

[¶ 6] Claude was not involved in financial management, marketing, or strategic planning for Bushmaster. He asserts that he made a substantial contribution to the suc-

cess of Bushmaster because he designed the product and put in place the production systems that made the company run. He testified that the company "is my whole life," and that he is "one of the guys that made the company what it is today."

[¶ 7] The company grew from three employees in the late seventies, to over seventy employees at the end of the marriage. The company had a tenfold expansion in sales from 1989 to 2002. Until recently, Bushmaster neither retained nor reinvested profits; it distributed nearly all its profits to shareholders. The majority stockholder made all decisions regarding distributions, employee compensation, bonuses, and benefits. Claude's compensation from wages, distributions and bonuses for the year 1989 was $97,808. His compensation peaked in 1994 at $1,781,346, and in the last year of his employment, 2001, was $539,851.

[¶ 8] By the late 1990s, Claude was effectively removed from his position at Bushmaster, though he continued to draw a salary until December of 2001, when his employment was officially terminated. Claude entered into a noncompete contract with Bushmaster, agreeing not to work for a competing company for five years. For the first three years of the agreement, he was paid $100,000 annually as consideration for not competing. He will receive no payment in the final two years of the agreement.

[¶ 9] Claude was fifty-seven years old at the time of the divorce hearing, and has some health issues.

[¶ 10] Before and during the marriage, Jenny also worked at Bushmaster. She started as an invoice clerk, then moved into purchasing, where she worked directly for Claude. The evidence indicates that

Jenny also devoted a great amount of time and energy to the company during the marriage. She resigned her position in June of 2000. Jenny's compensation in 1989 was $20,415. At the time of her resignation she was earning at a rate of $70,000 to $80,000 per year.

[¶ 11] After she left Bushmaster, Jenny decided to complete her education. She finished her undergraduate degree in September of 2000. In January of 2001, she started an MBA program. She graduated in May of 2002, and filed this action for divorce later that same month. She was not employed while she attended school. Jenny was thirty-eight years old at the time of the divorce hearing. She is in good health but does not intend to seek employment, except, perhaps, part-time consulting work.

[¶ 12] Other than the premarital stock, neither party brought any significant assets to the marriage. At the time of the divorce, aside from the Bushmaster stock, the marital estate consisted of cash, liquid securities, and real estate worth more than $3,000,000.

[¶ 13] Both parties' experts testified that the Bushmaster stock was difficult to value due to several factors: the stock is not publicly traded; there are restrictions on the sale of the stock; the industry is heavily regulated; and the value is susceptible to swings in sales related to political events and third-party litigation.

[¶ 14] The referee valued the premarital Bushmaster stock at $24 per share at or near the time of the marriage, for a total value of $30,240, and between $1641 and $1737 per share on December 31, 2002. This value was within the range of values testified to by the parties' experts.[1] Using

---

1. Jenny's expert valued the stock in 1989 at $51.10 per share, and on December 31, 2002, at $1737.23 per share, amounting to an increase in value during the marriage of

the value found by the referee, the non-marital shares appreciated in value at least $2,067,660 during the marriage.

[¶ 15] The referee determined that the increase in. value of the nonmarital Bushmaster stock that occurred during the marriage resulted from marital labor and therefore was marital property. The referee included that value in the marital estate, and effectuated an equitable distribution that resulted in each party receiving approximately one-half of the marital property. The referee did not award spousal support to either party.

[¶ 16] Claude filed a motion to amend the report or for additional findings of fact. The requested amendment related to the purchase price of the Bushmaster stock. Claude requested additional findings related to the parties' current circumstances, living expenses, and prospects for employment. The referee made additional findings pursuant to M.R. Civ. P. 53(e)(5), but declined to amend the report.

[¶ 17] Claude objected to acceptance of the referee's report. After reviewing the record and hearing arguments of the parties, the District Court pursuant to M.R. Civ. P. 53(e)(2), determined that the referee's findings of fact were not clearly erroneous, and entered judgment adopting the referee's report. Claude timely filed his notice of appeal to this Court.

[¶ 18] Claude contends that the court erred by including the increase in value of the Bushmaster stock in the marital estate, and acted outside its discretion by dividing the marital property approximately equally and failing to award him reimbursement support.

## II. STANDARD OF REVIEW

[¶ 19] When a trial court accepts a report of a referee, the findings of the referee become the trial court's findings, and we review those findings directly. *Hennessy v. Fairley*, 2002 ME 76, ¶¶ 17–18, 796 A.2d 41, 47.

[¶ 20] The determination of whether property is marital or nonmarital is a question of fact that we review for clear error. *Sewall v. Saritvanich*, 1999 ME 46, ¶ 14, 726 A.2d 224, 227–28. However, the application of the law to the facts is reviewed de novo. *Spooner v. Spooner*, 2004 ME 69, ¶ 7, 850 A.2d 354, 358. When we are asked to "determine [which] rule should be utilized in deciding whether property is marital or nonmarital, we do so de novo without deferring to the trial court's view of the law but honoring the trial court's finding of the facts as long as they are supported by the evidence." *Id.*

[¶ 21] We review, for a sustainable exercise of discretion, the grant or denial of spousal support, *Urquhart v. Urquhart*, 2004 ME 103, ¶ 3, 854 A.2d 193, 194, and the equitable distribution of marital property, *Murphy v. Murphy*, 2003 ME 17, ¶ 27, 816 A.2d 814, 822.

## III. LEGAL ANALYSIS

### A. Appreciation in Value of Nonmarital Property

[¶ 22] The Legislature has adopted the " 'shared enterprise or partnership theory' of marriage recognized in community property states." *Long v. Long*, 1997 ME 171, ¶ 7, 697 A.2d 1317,

---

$1686.13 per share, and a total increase in value of the 1260 nonmarital shares of $2,124,524.

Claude's expert valued the stock in 1989 at $24 per share, and on December 31, 2002, at

$446 per share, amounting to an increase in value during the marriage of $422 per share, for a total increase in value of the nonmarital shares of $531,720.

1320 (quoting *Tibbetts v. Tibbetts*, 406 A.2d 70, 76 (Me.1979)). A fundamental principle of community property law is that "the fruits of labor performed during marriage by either spouse ... belong to the marital community, and are not the separate property of the laboring spouse." AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS 4.05, cmt. a (2000). This principle is articulated in Maine law by 19–A M.R.S.A. § 953(2)(E)(2)(b). We are asked to decide whether the appreciation in value of Claude's premarital stock is fruit of labor performed by Claude during the marriage, and whether it was properly allocated to the marital estate.

[¶ 23] The statute that governs the appreciation in value of nonmarital property during the marriage, 19–A M.R.S.A. § 953(2)(E) (1998 & Supp.2004), provides, in relevant part:

2. Definition. For purposes of this section, "marital property" means all property acquired by either spouse subsequent to the marriage, except:

. . . .

E. The increase in value of property acquired prior to the marriage and the increase in value of a spouse's nonmarital property as defined in paragraphs A to D.

(1) "Increase in value" includes:

(a) Appreciation resulting from market forces; and

(b) Appreciation resulting from reinvested income and capital gain unless either or both spouses had a substantial active role during the marriage in managing, preserving or improving the property.

(2) "Increase in value" does not include:

(a) Appreciation resulting from the investment of marital funds or property in the nonmarital property;

(b) *Appreciation resulting from marital labor;* and

(c) Appreciation resulting from reinvested income and capital gain if either or both spouses had a substantial active role during the marriage in managing, preserving or improving the property.

(Emphasis added.)

[¶ 24] Section 953 was recently amended to add subparagraphs 2(E)(1) and (2). P.L.1999, ch. 665, § 1 (effective Aug. 11, 2000), *codified at* 19–A M.R.S.A. § 953(2)(E)(1), (2) (Supp.2004). The Legislative Summary, adopted from the Family Law Advisory Commission's comment to the amendment, describes its prospective impact on Maine's marital property law as follows:

[I]t excludes the increase in value of nonmarital property from the definition of marital property if no marital effort or money is expended.

. . . .

A spouse's active and substantial involvement does not depend upon whether the spouse received compensation for the spouse's efforts. A spouse's active but uncompensated time spent managing the spouse's premarital stock portfolio during the marriage is marital effort and any increase in the value of the portfolio flowing from reinvested income will be treated as marital property. Similarly, the increase in value of a nonmarital business during marriage resulting from reinvesting the business's income in the business will also be treated as marital property if either or both spouses actively managed the business during the marriage. *See MacDonald v. MacDonald,* 582 A.2d 976 (Me.1990).

. . . .

This provision also does not require proof that a spouse's active and substantial involvement in the asset's management, preservation or improvement was directly responsible for the income generated by a nonmarital asset. *It is a spouse's dedication of time and skills to the property during the marriage that brings the property's income within the ambit of the marriage's "shared enterprise."* It is not necessary to prove that the spouse's involvement was responsible for the income produced by the property.

L.D. 2267, Summary (119th Legis.2000) (emphasis added).

[¶ 25] We have discussed the amendments to section 953(2)(E) in two prior cases, both of which addressed whether a spouse played a substantial, active role during the marriage in managing, preserving, or improving nonmarital property pursuant to section 953(2)(E)(1)(b) and (2)(c). *Warner v. Warner,* 2002 ME 156, ¶¶ 28–35, 807 A.2d 607, 618–21; *Murphy,* 2003 ME 17, ¶¶ 27–28, 816 A.2d at 822. We have not previously addressed the issue of whether an increase in value resulted from marital labor pursuant to section 953(2)(E)(2)(b).

1.  Burden of Proof

■ [¶ 26] The burden of establishing that the value of separate property increased during marriage is on the party asserting the increase. *Sewall,* 1999 ME 46, ¶ 15, 726 A.2d at 228. Once that party establishes that an increase in value has occurred, the burden shifts to the party urging that the increase in value is not marital property to demonstrate that the increase resulted from factors listed in section 953(2)(E)(1). *See id.; Warner,* 2002 ME 156, ¶¶ 28–31, 807 A.2d at 619–20. If the opposing party fails to sustain the burden of establishing that the increase

resulted from market forces or passively reinvested income, the statutory presumption compels a finding that the increase in value of the separate property is marital. *See Sewall,* 1999 ME 46, ¶ 15, 726 A.2d at 228; *Warner,* 2002 ME 156, ¶ 31, 807 A.2d at 620.

[¶ 27] There is no dispute that Claude's premarital stock increased in value during the marriage. Thus, the burden shifted to Claude to establish that the increase in value did not occur due to marital labor, but occurred as a result of the appreciation factors listed in section 953(2)(E)(1).

2.  Allocation of the Increase in Value to the Marital Estate

[¶ 28] When analyzing whether the appreciation resulted from marital labor, the referee stated, "the critical analysis is whether a spouse had a significant and substantial role in the business such that it is reasonable to relate that spouse's efforts to the business' success." The referee found that Claude expended substantial effort and labor during the marriage working in significant management positions for Bushmaster, and that Claude, being responsible for product design and manufacturing, played a key role in Bushmaster's success. On this basis, the referee concluded that the increase in value of Bushmaster stock was attributable to Claude's marital labor and therefore constituted marital property.

[¶ 29] Claude argues that the referee erred in treating the increase in value as marital property because he holds only a minority interest in the company and never influenced the financial direction of the company. The fact that Claude owned only a minority interest in the company is not significant. A key employee's efforts can increase a company's value. It is not necessary that the employee have control over the company's financial direction.

Claude himself testified that he, with others, "made the company what it is today" and that Bushmaster was his whole life.

[¶ 30] Claude next contends that the referee erred in failing to distinguish between compensated and uncompensated marital labor. The referee found that the company's profits were not diverted from the marital estate back into the business, but instead, were distributed to shareholders and employees, including Claude, by means of generous wages and distributions. As a result, Claude contends, the marital estate has already been rewarded for his labor, and there is no need to blur the distinction between marital and nonmarital property to award Jenny a share of the increase in value of his nonmarital stock.

[¶ 31] The fact that the marital estate was compensated for Claude's labor with wages and distributions does not compel the conclusion that the appreciated stock value did not result from marital labor. Reimbursement for the diversion of marital funds is not the sole reason for including appreciated value of nonmarital property in the marital estate. Pursuant to section 953(2)(E)(2)(b), the marital estate is entitled to wages earned and appreciation of separate property resulting from the labor of either spouse, even if both wages and appreciation result from the same marital efforts.

[¶ 32] In *Knowles v. Knowles*, 588 A.2d 315, 317 (Me.1991), decided prior to the amendments to section 953(2)(E), the trial court had attributed all of the increase in value of the husband's separate video equipment business to the marital estate. The husband argued on appeal that because he had been adequately compensated during the marriage, the increase in value of his separate business should remain separate. *Id.* We rejected that argument, stating "[b]y attributing all of the increase in value to marital efforts, the court rendered the issue of compensation irrelevant." *Id.*

[¶ 33] There is ample support in the record, including Claude's own testimony, for a finding that Claude's dedication of time and skills to the company during the marriage increased the value of the stock. Claude had the burden of proof to demonstrate that the appreciated value of the stock was nonmarital, thus it was not error to include the appreciated stock value within the marital estate.

3. Apportionment of Appreciated Value

[¶ 34] Claude argues in the alternative that it was error for the referee to designate the entire appreciation in the value of his stock as marital property. He asserts that part of the increase in value resulted from market forces and should be set aside.

[¶ 35] The disposition of appreciated value of nonmarital property is generally not an all-or-nothing proposition. We differentiate "between the increase in value attributable to marital effort and that 'attributable to the inherent value of the property and the economic factors affecting it,' preserving the latter as separate property." *Knowles*, 588 A.2d at 317 (quoting *Macdonald v. Macdonald*, 532 A.2d 1046, 1050 (1987)). Attribution of appreciated value to marital labor or market forces is a factual determination, and a 100% apportionment to either separate or marital property is not precluded where factually warranted. *See id.*

[¶ 36] Claude asserts that the evidence shows that his most important contributions to the company, the design and manufacture of the systems to create a complete rifle, were in place before the marriage. He further contends that the company's increased sales after the mar-

riage were due not to his efforts, but to external political forces such as the proposed assault rifle ban, the anticipated millennium computer bug, and the September 11, 2001, terrorist attacks.

[¶ 37] In addition, Claude argues that the appreciation occurring after 1998, when he was stripped of his duties, could not be attributed to his efforts and should be set aside. Alternatively, he argues that any increase in value after 2001, when he was removed from employment with the company, cannot be attributed to his labor.

[¶ 38] In *Knowles*, even though the evidence showed that technological innovations had occurred in the video field and market conditions favored growth of the company, the trial court determined that all of the increase in value was attributable to the husband's efforts. *Id.* We affirmed, stating that the trial court "did not clearly err in finding that such innovations would not have affected the stock value without husband's efforts." *Id.*

[¶ 39] On this issue, Claude had the burden of proof, and the referee was not persuaded that any portion of the increase in value could be attributed to market forces alone.[2] The evidence demonstrates that while Claude put the company's production systems in place prior to the marriage, he was in charge of manufacturing and operations during the marriage. While demand may have risen in response to external political forces, the referee did not clearly err in determining that such forces would not have affected the stock value without Claude's efforts.

[¶ 40] Further, it was not clear error for the referee to have included the appreciation up to 2002. The date is not so remote in time from Claude's departure from the company as to deprive that valuation date of probative value, and the conclusion that Claude's marital effort continued to add value to the company after he left is supported in the record by Claude's own testimony.

### B. Reimbursement Support

[¶ 41] The referee awarded neither party spousal support. Claude contends the referee exceeded the bounds of its discretion in not awarding him reimbursement support. He asserts that he supported Jenny's educational advancement during the marriage, that she did not work at all while she attended school, and that Jenny, at age thirty-eight, with an MBA, is in a better position than Claude to earn an income after the marriage. Claude argues that he has only a high school education, is precluded from working in his field for at least two more years, and at age fifty-seven[3] with health issues, is in a poor position to obtain new employment. This difference, he asserts, qualifies him for reimbursement support.

[¶ 42] Title 19–A M.R.S.A. § 951–A(2) lists five possible types of spousal support, including reimbursement support. Reimbursement support is authorized as follows:

> C. Reimbursement support may be awarded to achieve an equitable result in the overall dissolution of the parties' financial relationship in response to exceptional circumstances. Exceptional

---

2. Because we conclude that the 100% attribution of the increase in value to marital property is not clear error in this case, we do not reach the issue of how to compute the percentages that should be attributed to marital property and separate property. For a discussion of different valuation methods, *see* *generally*, J. Thomas Oldham, *Separate Property Businesses that Increase in Value During Marriage*, 1990 WIS. L. REV. 585.

3. The parties' ages are stated as of the time of the divorce hearing.

circumstances include, but are not limited to:

(1) Economic misconduct by a spouse; and

(2) Substantial contributions a spouse made towards the educational or occupational advancement of the other spouse during the marriage.

Reimbursement support may be awarded only if the court determines that the parties' financial circumstances do not permit the court to fully address equitable considerations through its distributive order pursuant to section 953.

19–A M.R.S.A. § 951–A(2)(C) (Supp.2004).

[¶ 43] The referee found that the parties' substantial assets and other financial circumstances *permitted the judgment to fully address equitable considerations through the distribution of property* pursuant to section 953. Given the evidence of the parties' significant means, the decision not to award Claude reimbursement support is well within the scope of the referee's discretion, and is supported by section 951–A(2)(C).

## C. Equitable Distribution of Property

■ [¶ 44] The parties agree that the referee achieved an approximately equal distribution of the marital property. Claude contends that an equal distribution is not equitable for the same reasons he claims entitlement to reimbursement support.

■ [¶ 45] In a divorce action, "the court shall set apart to each spouse the spouse's property and shall divide the marital property in proportions the court considers just after considering all relevant factors." 19–A M.R.S.A. § 953(1) (1998). The statute provides for a "just" distribution, which "is not synonymous with an equal distribution.... [w]e have made it clear that a court is not required to divide the marital property equally, but is required to make the division fair and just considering all of the circumstances of the parties." *Murphy*, 2003 ME 17, ¶ 27, 816 A.2d at 822 (alteration in original) (quotation marks omitted).

[¶ 46] There is ample support in the record for an approximately equal distribution of the marital property in this case: (1) most of the parties' substantial assets accumulated during the marriage; (2) there is a huge disparity in historical earnings in Claude's favor; and (3) the referee might have, but did not, award Jenny support.

[¶ 47] The equal distribution of marital property was within the referee's discretion.

The entry is:

Judgment affirmed.